Filed 6/7/13  In re L.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.W., <br><br> Defendant and Appellant. | E057716 <br><br> (Super.Ct.No. J238349) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

1

The juvenile court terminated E.W.'s (Father) parental rights to his daughter, L.P. (Welf. & Inst. Code, § 366.26)[1] and denied Father's request to change a court order (§ 388). Father contends the juvenile court erred by terminating his parental rights because the court should have applied the beneficial parent-child relationship exception to termination. (§ 366.26, subd. (c)(1)(B)(i).) Father contends the juvenile court erred in denying his request to change a court order because Father proved his circumstances had changed and he had a strong bond with L.P. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A.    BACKGROUND

Father and T.P. (Mother) were homeless in Kern County. Father resided in a homeless shelter, while Mother resided in a park. L.P. is female and was born in August 2010. Father had been unaware of L.P.'s birth until he coincidentally saw Mother applying for aid while he was applying for food stamps. After L.P.'s birth, Father found a residence for himself, Mother, L.P., and Mother's mother (Grandmother), in Bakersfield.

On December 27, 2010, Father told Mother to leave the residence. Father made Mother leave with L.P.; Mother was unable to take any belongings with her, and it was raining. Mother went to live with L.P.'s maternal aunt, H.E. (Aunt) On December 27, 2010, Mother and Grandmother were struck by a big rig truck while crossing the street. Both Mother and Grandmother died on December 28.

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

On December 28, Father arrived at Aunt's house seeking custody of L.P. Aunt convinced Father to stay at Aunt's home, because Father "had no items for the child." Father left with L.P. on January 3, 2011. Father took L.P. to Kern Medical Center on the advice of an attorney, after Father called the attorney "to try to obtain items for the child"—presumably this attorney was involved in Father's lawsuit related to Mother's death.

B.   DETENTION

On January 4, the Kern County Department of Human Services (Kern Department) received a referral reflecting Father had kept L.P. "'out in the cold with very little clothes on.'" L.P. was in the hospital; she was suffering from pneumonia. The reporting party stated Father was homeless and keeping L.P. for the settlement money associated with Mother's death. The Kern Department found L.P. had been admitted to the hospital with pneumonia. L.P. was "very dirty" when she arrived at the hospital. Father told the Kern Department L.P. had been sick for two weeks.

The hospital social worker was concerned about discharging L.P. into Father's custody because (1) Father was not listed on L.P.'s birth certificate, (2) Father had no proof he was L.P.'s father, and (3) Father told a nurse he had been living in Arizona and only came to town for Mother's funeral. Father was very dirty when he arrived at the hospital; the hospital gave him clothes, food, and a shower. Father told staff at the hospital that he did not have any money or clothing.

Father admitted smoking methamphetamine on two occasions in 2006 or 2007. Father also drank "a lot," but stopped around 2001. Father admitted smoking marijuana

3

from the time he was 18 years old; Father smoked marijuana approximately every other day. Father was born in 1966, so he was 18 years old in 1984.

The Kern Department placed a hold on L.P. at the hospital. The Kern Department filed a petition alleging L.P. was at risk of suffering serious physical harm or illness if left in Father's care because (1) Father had been unable to provide a stable home for L.P. for two weeks; (2) L.P. was hospitalized for pneumonia and Respiratory Syncytial Virus; (3) Father failed to seek immediate medical attention for L.P.'s illness; (4) Father was a chronic abuser of marijuana; and (5) Father lived a "nomadic lifestyle" and did not have a stable home. (§ 300, subd. (b).) The Kern County juvenile court (the "Kern Court") found the Kern Department made a prima facie showing that L.P. came within section 300, and ordered L.P. be detained.

C.    JURISDICTION

L.P. was placed on "a temporary visit" with maternal cousins, M.P. (Cousin) and C.P. (collectively "Cousins"), in Norco.[2] Father failed to visit L.P. during a scheduled visit on January 11. The following day, Father contacted the Kern Department and explained he missed the visit because he was suffering from a 102-degree fever. Father missed another scheduled visit on January 29. Father called Cousins "constantly requesting photos of [L.P.] and to talk to [Cousins]." Cousin told Father he could not call Cousin, but then Cousin began receiving "non[-]stop calls from the paternal grandparents."

---

[2] It is unclear from the record if Cousins are L.P.'s great-aunt and uncle or L.P.'s cousins.

A DNA test revealed there was a 99.99 percent probability that Father was L.P.'s father. A drug test reflected Father tested positive for marijuana on January 7. Father had a prior conviction for cruelty to a child, which caused him to serve three months in jail. Father was residing with friends in Bakersfield. Father said he had known the friends for 15 years, but did not know their last names.

The Kern Court declared Father to be L.P.'s presumed father. The Kern Court declared L.P.'s residence to be Kern County and found she came within section 300, subdivision (b) in that her needs were not being met.

Approximately two weeks later, the Kern Court found Father legally resided in Vidal, in San Bernardino County. The Kern Court declared San Bernardino County to be Father's and L.P.'s county of residence. The Kern Court transferred the case to San Bernardino County for disposition. San Bernardino accepted the case. The San Bernardino County Juvenile Court ordered Father to have supervised visits with L.P. one time every other week for four hours.

D.    DISPOSITION

L.P. continued to reside with Cousins on "an extended visit." L.P. was happy and blending in well with Cousins' family. Father admitted abusing methamphetamine for a one-year period while dating Mother. Father was living in a trailer that his parents owned, in Vidal. Vidal is a sparsely populated area. Vidal residents must travel to Blythe, California or Parker, Arizona for food, medical care, and other services. Father offered to move to Needles, in order to receive services and comply with his case plan. Father did not have a stable source of income.

5

The juvenile court declared L.P. a ward of the court, found Father to be L.P.'s presumed father, and ordered L.P. continue to be placed outside of Father's physical custody. The court granted Father two two-hour visits with L.P. per month.

E. SIX-MONTH REVIEW

L.P. was officially placed in Cousins' home, as opposed to being on an extended visit. An attorney was representing L.P., L.P.'s half brother, and Aunt in a civil lawsuit related to Mother's death. The lawsuit centered on a one million dollar insurance policy, and the attorney was hoping to increase the amount awarded to L.P., L.P.'s half brother, and Aunt—the three would split the sum equally. Father was listed as L.P.'s guardian ad litem. Father was requesting money for himself, due to his own pain and suffering for the loss of Mother; however, Father and Mother were never married and were not a couple at the time of her death.

Father moved his trailer to Needles and began residing there. Father obtained a job at a fast food restaurant. Father's case plan required him to participate in parenting classes, counseling, and outpatient drug treatment. Father sometimes appeared sober and healthy. At other times, Father appeared "very unkempt" and "not so sober." In July, Father arrived at the Department's office with three certificates of completion related to his case plan. Father expected the immediate return of L.P. A social worker explained that Father would have to wait until the six-month review hearing. Father became irate and was asked to leave the building.

The social worker spoke to Father's drug counselor, who confirmed she had informed Father he would need aftercare, including drug testing. Father had become

6

irate with the drug counselor and was "unnerved by the request to drug test." On August 11, Father said he was unable to urinate for a drug test, even when he was given water. On August 16, Father tested positive for methamphetamines. Father explained he took methamphetamines because he worked a late shift and then needed to stay awake to drive to Riverside to see L.P. Father's story was problematic because he did not have a valid driver's license. Father admitted being under the influence of methamphetamines during his visit with L.P.

During the visits, Father often let Cousin, who supervised the visits, tend to L.P. when she was crying or needed a diaper change. When the Department instructed Cousin to allow Father to parent L.P. during the visits, Cousin agreed. Father appeared "uncomfortable and unsure of what to do when [L.P.] cried and he was unprepared for [Cousin's] lack of involvement." Father was given unsupervised time to change L.P.'s diaper, and during that time L.P. "was heard screaming to the top of her lungs." At one point, Father requested the visits take place at a Bass Pro Shop. The Department explained such a store is not an appropriate place for a visit with an infant. Father agreed to have the visits take place at a restaurant.

Cousins have two of their own children, who were three and five years old in 2011. The children considered L.P. to be their sister. L.P. was "intertwined" with Cousins' family. Cousin maintained contact with L.P.'s 13-year-old half brother, who was adopted by his maternal aunt and uncle. On November 9, Cousins requested de facto parent status.

7

At a hearing on November 16, the juvenile court referred Father and the Department to mediation on the issue of returning L.P. to Father. At the mediation, Father and the Department agreed Father would continue with his reunification services and Father would receive six hours of unsupervised visits with L.P. At a hearing on December 7, the juvenile court found it was in L.P.'s best interests to not address the issue of terminating Father's parental rights, and that L.P. was likely to be returned to Father's custody. The court ordered Father to participate in reunification services and granted him weekly six-hour unsupervised visits with L.P.

F.       TWELVE-MONTH REVIEW

Father's visits were increased to two weeks at a time, so each visit lasted two weeks. Father was able to meet L.P.'s needs and L.P. looked to Father when she wanted to be held. Father was working at two jobs: (1) a part-time job at a retail store, and (2) several eight-hour days each week at a local marina. Father repeatedly tested negative for controlled substances. However, on May 27, 2012, Father was arrested for driving under the influence and child endangerment. Father was seen "weaving all over the road in Blythe" at 1:34 a.m. with L.P. in the car. Father admitted drinking alcohol. Father did not report the incident to his substance abuse counselor.

A social worker asked why Father drove drunk with L.P. in the car; he explained it was late at night and he did not want to bother the babysitters. Father also said he was not drunk, since he only had two shots of whisky. Father said he did not report the drunk driving to his substance abuse counselor because he was ashamed. Father said he failed to attend Alcoholics Anonymous and/or Narcotics Anonymous meetings during

8

the month of May because he "'was busy with [his] daughter; doing other things.'"

Father twice told the social worker that he was not an alcoholic.

Cousin told a Department social worker L.P. would need to be placed in foster care if the juvenile court granted Father another six months of services because the matter took "'a big toll'" on her family and the family did not "'want anything to with [Father] again.'" The juvenile court found Father failed to make substantive progress in the court ordered treatment plan. The court terminated Father's reunification services. The court granted Father supervised visits for two hours every two weeks.

G. TERMINATION

L.P. was returned to her placement at Cousins' home. When L.P. was initially returned to the placement from Father's house, L.P.'s nights and days were flipped, so that she was awake at night and sleeping during the day. L.P. also suffered nightmares upon her return. After some time at Cousins' home, L.P.'s nightmares ceased and she returned to sleeping at night and being awake during the day. L.P. was small in size and suffered some asthma-like symptoms, but met her developmental milestones and appeared bonded to Cousins. Cousins wanted to adopt L.P.

Father attended all of his visits with L.P., which took place in Barstow. During the visits, Father played with L.P. and read books to her. L.P. usually cried when separated from Cousin, in order to be transported to Barstow; however, L.P. would "cheer up" when told she would be seeing Father.

On November 14, 2012, Father filed a request to change a court order. Father requested the juvenile court return L.P. to his custody or that he be granted reunification

9

services and unsupervised overnight and weekend visits. Father asserted circumstances had changed because he was participating in a substance abuse treatment program, testing negative for controlled substances, working at a job, attending classes to obtain his G.E.D., completed individual counseling, and living in a stable environment. Father alleged the change would be in L.P.'s best interests because Father and L.P. shared a strong bond and L.P. was happy when she visited Father.

In November, it appeared Father was complying with his treatment plan, with the exception of obtaining full-time employment. The Department concluded Father "care[d] deeply for his daughter," but Father's history of relapsing into substance abuse made it unsafe to return L.P. to his custody.

A contested termination hearing took place on December 5, 2012. Joanne Watts (Watts), L.P.'s adoption social worker, testified at the hearing. Watts believed L.P. enjoyed playing with Father during visits. Watts explained Father's grandchildren were currently going through an adoption process, but Father was excluded as a possible placement for those children due to his unstable housing, history of drug and alcohol abuse, prior substantiated referral for physical abuse of his daughters in 2003, and his criminal history. Watts believed L.P. viewed Cousins as parental figures because L.P. referred to Cousins as "Mom and Dad." Watts concluded it would be detrimental to L.P. to remove her from Cousins' home, because L.P. "has experienced enough loss in her short life already."

Sonia Gallegos (Gallegos), a Department employee who supervised visits between L.P. and Father, also testified at the hearing. L.P. "always seem[ed] happy" to

see Father. Gallegos believed Father had a pattern of conduct, which she described as follows: "It seems the father is able to complete programs and get wonderful references, but his sobriety seems to last five or six months. And then we're kind of [starting] from square one again." Gallegos opined that L.P. would not be safe in Father's care due to this pattern of conduct. Gallegos cited Father driving drunk with L.P. in the car as an example of Father's inability to protect L.P. Gallegos believed it would be detrimental to L.P. to remove her from Cousins' home because L.P. had been in the home "so long" and L.P. bonded with Cousins.

Father testified at the hearing. Father was working part-time at a barber shop. Father pled guilty to drunk driving in the incident involving L.P. Father was attending Alcoholics Anonymous meetings six or seven times per week. Father explained that he had L.P. in his care for one month on an extended visit—May 2012, which was when he was found driving drunk. Father conceded he had a pattern of being sober for up to eight months and then relapsing.

In regard to Father's request to change a court order, the juvenile court found there had not been a change in circumstances "since the case started and certainly not since services were terminated." The juvenile court explained to Father, "[W]ith your long history of addiction and periodic relapse being an ongoing problem, I just don't have any confidence that we're in a different place now than we were six months ago or a year ago. [¶] And it does not mean that you're not personally making some progress, but there has not been a change in circumstances. [¶] I would fear that if the child were returned to you, that you would relapse, and it would be an ongoing problem."

11

The juvenile court also found it was not in L.P.'s best interests to change the court's order because L.P.'s interests would be best served by "leaving things as they are with the caretakers and to go forward." Thus, the court denied Father's request to change a court order. (§ 388.)

In regard to terminating Father's parental rights, the juvenile court found the parent-child bond exception did not apply in this case. The court concluded Father and L.P.'s relationship did not support application of the exception. The court explained, "It's more of a friendly person who she sees here on an infrequent but regular basis like an extended family member, not as a parent." Thus, the court terminated Father's parental rights and ordered adoption be L.P.'s permanent plan.

## DISCUSSION

### A. REQUEST TO CHANGE A COURT ORDER

Father contends the juvenile court erred by denying his request to change a court order (§ 388) because his circumstances had changed and he has a strong bond with L.P. We disagree.

Under section 388, a parent may petition a juvenile court to modify a previous order on the grounds of changed circumstances. (§ 388; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) The petitioner has the burden to show, by a preponderance of the evidence, a change of circumstances, and to show that the proposed modification is in the child's best interests. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; Cal. Rules of Court, rule 5.570(h)(1).) "We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. [Citations.]" (*In re B.D.*, at p. 1228.)

The juvenile court's finding that Father's circumstances had not changed was within reason because Father's sobriety was relatively new. Father began abusing drugs at the age of 18, and was approximately 46 years old during the dependency proceedings. Father supported the section 388 petition with proof that he was in a treatment program and maintaining his sobriety. A drug test reflected Father tested positive for marijuana on January 7, 2011. In July 2011, Father arrived at the Department's office with three certificates of completion related to his case plan. Father expected the immediate return of L.P. On August 16, Father tested positive for methamphetamines. Father explained he took methamphetamines because he worked a late shift and then needed to stay awake to drive to Riverside to see L.P. Father does not have a valid driver's license. Father admitted being under the influence of methamphetamines during his visit with L.P.

On December 7, 2011, the juvenile court ordered Father to participate in reunification services and liberalized his visits with L.P. On May 27, 2012, Father was arrested for driving under the influence and child endangerment. Father was seen "weaving all over the road in Blythe" at 1:34 a.m. with L.P. in the car. Father admitted drinking alcohol.

Given the evidence of Father's 28-year history of abusing drugs and alcohol, and his history of relapsing after months of sobriety, the juvenile court was within reason when it concluded Father's six months of sobriety, from June to December 2012, did not sufficiently prove a change in circumstances. As noted by the juvenile court, Father was making progress, but had not sufficiently changed the substance abuse issue.

13

In regard to the second prong, the best interests of the child are determined by considering (1) the seriousness of the problem that led to the dependency; (2) the strength of the parent-child bond; and (3) whether the problem that led to the dependency has been resolved, or the ease with which it may be resolved. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685.)

L.P. was detained because (1) Father had been unable to provide a stable home for L.P.; (2) Father failed to seek immediate medical attention for L.P.'s illness; and (3) Father is a chronic abuser of marijuana. (§ 300, subd. (b).) Father's drug abuse appeared serious, since he had been using drugs for over 20 years. Father had begun resolving the drug abuse issue by participating in the treatment process, but given his troubles with relapsing, the juvenile court could reasonably conclude Father's progress was too limited to consider the substance abuse issue to be resolved.

As to the parent-child bond, Father had positive visits with L.P. However, it appears L.P. only resided with Father for a very brief time before the dependency started, so she mainly saw him during visits. Father admitted being under the influence of methamphetamines during one visit, and he was found driving drunk during a second visit. Given (1) the evidence that Father chose to allow his drug and alcohol abuse to interfere with his visits with L.P., and (2) L.P.'s young age at the time of removal, the juvenile court could reasonably conclude the two were not strongly bonded. While Father and L.P. appeared to enjoy their time together the bond was not that of a parent and child, but more a friendly visitor.

In regard to resolving the problem, Father was found driving drunk with L.P. in the car in May 2012. Due to the recent timing of that incident the juvenile court could conclude Father had not resolved the substance abuse issue that led to the dependency. Further, given the evidence of Father's 28-year history of substance abuse and history of relapsing, the juvenile court was within reason in finding the substance abuse problem would not be easily resolved because Father had struggled with this problem for over half his life.

Father argues he did "*everything* within his power to show that circumstances had changed" and therefore the section 388 petition was a "sham," in that the termination of his parental rights was inevitable because he had "no genuine way of rebutting the 'presumption that arises after termination of reunification [services].'" Father's argument is not persuasive because he is presenting this issue as though a legal injustice was created but that is not the case. The juvenile court heard Father's request to change a court order. Thus, due process was provided. The process did not break-down and it was not a sham, rather, there was overwhelming evidence supporting the denial of the petition, which likely made it difficult for Father to prove his request should be granted. The fact that Father was confronted with large amounts of unfavorable evidence does not make the process a "sham." Thus, we find Father's argument to be unpersuasive.

Father contends he proved changed circumstances because he obtained a stable living environment. Father asserts he proved the changed order would be in L.P.'s best interests because he has a strong bond with L.P., as evinced by Father constantly calling

Cousins for photographs of L.P., and Father's testimony that he would love to have L.P. back in his custody. Father's argument is not persuasive because he is only presenting the evidence that directly contradicts the juvenile court's ruling. This argument is problematic because we cannot substitute our discretion for that of the juvenile court, and we must give a high degree of deference to the court's ruling. (*In re J.N.* (2006) 138 Cal.App.4th 450, 459.) Since there is evidence supporting the juvenile court's ruling, we cannot reverse the ruling merely because there is contradictory evidence.

## B. TERMINATION OF PARENTAL RIGHTS

Father contends the juvenile court erred by terminating his parental rights because the court should have applied the parent-child bond exception. (§ 366.26, subd. (c)(1)(B)(i).) We disagree.

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable. (§ 366.26, subd. (c)(1).) One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "The benefit to the child from continuing such a relationship must . . . be such that the relationship '"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."' [Citation.]" (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) In other words, for the exception to apply, the bond between the parent and child must be a parent-child bond, rather than the type of bond a child might have with a friendly visitor

16

or non-parent relative, such as an aunt.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.)  We review the juvenile court's decision to not apply the parent-child bond exception for an abuse of discretion.[3]  (*In re Aaliyah R.*, at p. 449.)

It appears from the record that Father missed some visits when the dependency initially started, but otherwise consistently visited L.P.  Accordingly, the record reflects that Father maintained regular visitation and contact with L.P.

Now we turn to the issue of whether L.P. would benefit from continuing the relationship with Father, such that continuing the relationship outweighs the benefit L.P. would gain from being in an adoptive home.  Gallegos believed it would be detrimental to L.P. to remove her from Cousins' home because L.P. had been in the home "so long" and L.P. bonded with Cousins.  Watts believed L.P. viewed Cousins as parental figures because L.P. referred to Cousins as "Mom and Dad."  Watts concluded it would be detrimental to L.P. to remove her from Cousins' home, because L.P. "has experienced enough loss in her short life already."

L.P. was four months old when she was detained.  L.P. appeared to enjoy seeing Father; however, Father's interactions with L.P. appear to be more akin to a friendly

---

[3] There appears to be a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception.  (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [Fourth Dist., Div. One applied the substantial evidence standard.].)  We choose to follow the precedent of *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, which explained the abuse of discretion standard is applicable because "[t]he juvenile court is determining which kind of custody is appropriate for the child[, and s]uch a decision is typically review[ed] for abuse of discretion."

visitor or non-parent relative, such as an uncle. It does not appear L.P. was particularly upset when the visitation sessions ended, or that she was particularly anxious to visit Father, as evinced by her crying when separated from Cousin. Further, Father was under the influence of methamphetamine during one visit and under the influence of alcohol during a second visit. Given the unstable nature of Father's sobriety and the lack of parent-child relationship between Father and L.P., the juvenile court's decision to not apply the parent-child bond exception was within reason. Thus, we conclude there was no error.

Father contends he does not need to show that his relationship with L.P. is more than that of extended family members. Father asserts he only needs to show "[a] '"substantial positive emotional attachment."'" To support this contention Father cites an opinion from Fourth District, Division One, which sets forth the rule that the juvenile court must make a determination about whether continuing the relationship with the parent will benefit the child to such a degree as to outweigh the benefit the child would gain from being in a permanent home. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) In *In re S.B.* the appellate court concluded a parent did not need to prove the child had a "'primary attachment' to the parent"; rather, it was sufficient to show "the child has a 'substantial, positive emotional attachment' to the parent." (*Id.* at p. 299.)

Father's argument is not persuasive because, in a more recent opinion, the Fourth District, Division One Court has changed its position on the parent-child bond exception. In *In re Jason J.* (2009) 175 Cal.App.4th 922, 937, the court explained that *In re S.B.* "does not, of course, stand for the proposition that a termination order is

18

subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." The court then gave the following rule: "'[F]or the [parent-child bond] exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' [Citation.]" (*Id.* at p. 938.) Given that the Fourth District, Division One has clarified its rule and concluded the parent-child bond exception requires a parent-child relationship, we are not persuaded by Father's argument that he need only show the type of relationship that would exist between a child and extended family member.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                                            J.

We concur:

KING
        Acting P. J.

CODRINGTON
                J.